Filed 6/24/26  P. v. Zayas CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EFREN ZAYAS,<br><br>    Defendant and Appellant. | B340963<br><br>(Los Angeles County<br>Super. Ct. No. NA112459) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daniel J. Lowenthal, Judge.  Affirmed.

Mark S. Smith, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Efren Zayas appeals from a judgment of conviction after a jury found him guilty of second degree murder (Pen. Code, § 187, subd. (a))[1] and found true that he personally used a firearm (§ 12022.53, subd. (b)).  On appeal, Zayas contends: (1) insufficient evidence supports his conviction for murder; (2) the court erred in admitting a police officer's testimony; (3) the prosecutor committed misconduct; (4) defense counsel provided ineffective assistance of counsel; (5) the cumulative effect of these errors was prejudicial; (6) there was a violation of the Racial Justice Act; and (7) the court abused its discretion by denying Zayas's motion to dismiss his prior strike conviction under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 and section 1385.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Evidence at Trial*[2]

    1.    *Overview*

On October 11, 2018, at around 11:00 p.m., Ricardo Torres, who was a member of the West Side Wilmas gang and went by

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    Zayas's opening brief includes a section titled "Statement of Facts," but the section only includes procedural history.  Nowhere in the brief did Zayas include a summary of the facts of the underlying conviction.  A defendant's opening brief must "[p]rovide a summary of the significant facts."  (Cal. Rules of Court, rule 8.204(a)(2)(C); see *id.*, rule 8.360(a) [except for reasons not pertinent here, briefs in criminal cases "must comply as nearly as possible" with civil rules on briefing]; *Slone v. El Centro Regional Medical Center* (2024) 106 Cal.App.5th 1160, 1173 ["In every appeal, the appellant has the duty to fairly

the moniker "Hefty," was shot to death inside his car. His car was stopped near Foc'sle Bar, a "known gang hangout" located on the border between territories controlled by two rival gangs: West Side Wilmas and East Side Wilmas. Zayas and codefendant Eduardo Carrillo[3] were members of East Side Wilmas.

Surveillance video footage from Foc'scle Bar showed Zayas and Carrillo near Torres's car when four muzzle flashes erupted inside the car. Zayas and Carrillo then fled together in the same getaway car. Desiree Campos, who was present at Foc'scle Bar, saw someone who looked like Zayas approach Torres's car with a gun in his hand; moments later, she heard gunshots. Torres died at the scene.

2. *Police investigation*

At 11:15 p.m. on October 11, 2018, police officers with the Los Angeles Police Department (LAPD) arrived at the Foc'sle

---

summarize all of the facts."].) " 'Further, the burden to provide a fair summary of the evidence "grows with the complexity of the record." ' " (*Slone*, at p. 1173.) "A reviewing court will not independently review the record to make up for appellant's failure to carry his burden." (*Id*. at p. 1174.) Zayas's record on appeal is about 2,000 pages long, and his failure to provide a summary of the facts forfeits his claims on appeal. (See *id*. at p. 1175 [appellant's failure to include a proper statement of facts in opening brief forfeited contentions]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1247 [same].) Nonetheless, we exercise our discretion to consider the merits. (*People v. McCullough* (2013) 56 Cal.4th 589, 593 ["neither forfeiture nor application of the forfeiture rule is automatic," and appellate courts have discretion to review otherwise forfeited challenges].)

[3] At some point before trial, the People dismissed the charges against Carrillo.

Bar. They found a car with its front passenger window nearly all the way down and with Torres slumped in the driver's seat.

Officers collected five discharged cartridge casings from inside the car. The casings had the same headstamp, indicating they were all fired from a .40 caliber firearm. The location of the casings showed the gun was inside the car when it was fired.

An autopsy later disclosed that Torres died of multiple gunshot wounds. He had a total of six gunshot wounds: one to the back of his head; three to his right shoulder; one to his abdomen; and one to his left hand. There was stippling present on Torres's body, which signified the end of the gun was close to his body, "likely a couple inches away," when fired. Torres also had five bullets in his body that all came from the same firearm.

3.      *Surveillance video*

Surveillance video from both inside and outside Foc'sle Bar captured relevant events, and the People played the video for the jury. The video showed that on October 11, 2018, at 9:40 p.m.,[4] an SUV parked near Foc'sle Bar. Three individuals got out of the car, walked toward the bar, and went inside. One of the individuals wore a black T-shirt with a "big white square in the front of the shirt." Both LAPD Detective Matthew Maffei and Officer Andrew Martinez identified that person as Zayas. Zayas and the two other individuals stayed inside the bar for a few minutes. The three left the bar and drove away in the SUV.

---

[4]      The time stamp on the video was 10:03 p.m., but it was 23 minutes fast. We will refer to the actual, adjusted times.

4

Approximately 30 minutes later, the same SUV returned and parked near the bar.[5] Zayas and another individual, later identified as Carrillo, approached the bar. They walked past the front door of the bar and toward the area where Torres was later shot. They then returned to the bar and went inside.

At 10:44 p.m., Zayas approached a woman, later identified as Campos, and she lit his cigarette before they separated. At 10:59 p.m., Zayas approached Campos again and motioned his head in the direction of the door. Zayas then exited the bar, followed by Campos. While they were outside, they lit each other's cigarettes. At the same moment, a car, later identified as Torres's car, drove through the intersection near the bar. Zayas "motion[ed] in a backwards manner" toward Campos with his right arm, and Campos stepped backward.

At 11:00 p.m., Zayas walked toward Torres's car. For a couple of seconds, Campos faced Zayas before she headed back to the bar. Torres's car made a U-turn and stopped at a point that was shrouded in darkness on the video. Zayas disappeared into the darkness as he continued to walk toward Torres's car. Seconds later, Carrillo exited the bar and walked toward Torres's car until his image similarly disappeared into the darkness.

At 11:01 p.m., the surveillance video showed that "where … Torres's vehicle had come to rest … four muzzle flashes c[ame] from that vehicle." A few seconds later, Carrillo was visible next to an electrical box on the sidewalk near Torres's car. The distance between the electrical box and the passenger window of Torres's car was 28 feet. Carrillo then walked back to the bar,

---

[5] Maffei and Martinez identified the driver as Jesse Hernandez.

5

went inside, walked out the back exit, and made his way to the parked SUV. Zayas also walked back to the bar, passed the entrance, and walked down the sidewalk to the same SUV.[6] At 11:02 p.m., the SUV drove away.

4. *Campos's statements*

The parties stipulated that Campos died on January 22, 2022, of an accidental drug overdose, and her death was not related to this case. The court deemed Campos unavailable, and the parties read to the jury her testimony from a prior hearing.

Campos testified that, on the night of the shooting, she went to Foc'sle Bar. She "was drunk," "doing drugs," and had been "up for three or four days." At some point, Campos went outside, and a man who was outside lit her cigarette. When the prosecutor asked her what the man did after lighting her cigarette, Campos testified that she could not remember. Campos denied that she ever saw Torres, whom she knew as "Hefty," drive by.

The prosecutor then played recordings from Campos's interviews with Maffei on May 30 and July 25, 2019. On May 30, 2019, Campos told Maffei that she went to Foc'sle Bar on October 11, 2018, and saw "a crowd" of four or five "gang members." She could sense that the crowd was "up to something" bad.

Campos told Maffei that she went outside, and one of men from the crowd followed her and lit her cigarette. Campos said

---

[6] While Zayas walked toward the SUV, a car drove by and someone inside the car fired gunshots in the direction of Zayas. Zayas fell to the floor, got up, and continued to make his way to the SUV. At trial, the People did not admit any further evidence regarding this drive-by shooting.

6

the man did not have any tattoos, but she "wasn't really paying attention." The man said, " 'I don't think you should be out here right now.' " At some point later, Campos saw "Hefty" pull up in a car, make a U-turn, and "s[i]t there" in his car. The man who lit Campos's cigarette pointed a gun at Hefty and "cocked" it, then put the gun down and walked up to Hefty's car. Within seconds, Campos heard four or five gunshots, but she did not see who pulled the trigger. Campos saw only "one guy walking up" to Hefty's car.

On July 25, 2019, Maffei showed Campos numbered photographs of six different people. He asked her if she saw the person who lit her cigarette, had a gun in his hand, and walked toward Hefty's car. Campos said, "It kind of looks like No. 2," and, "Yeah, but then also No. 4." Zayas was depicted in photograph number 4.

At the hearing, after the prosecutor played the recordings, the prosecutor asked Campos, " '[H]aving heard that, what happened October 11, 2018?" Campos responded, "I'm not going to lie. I wasn't sure if it was a gun or not." During cross-examination, Campos stated that the person who lit her cigarette did not have any tattoos. Campos acknowledged that she could see that Zayas had tattoos on his arms as he sat at the defense table.

5. *Zayas's arrest and jail phone call*

On July 24, 2019, the police arrested Zayas and informed him of the charges against him. A few days later, Zayas made a phone call from jail, stating, "I'm moving forward. Beat this case and ... get the fuck out and start balling again. I ain't trippin'. [¶] But this time I'ma do it right, man. I ain't gonna do it all sloppy. I got a little sloppy."

7

B.    *Charges, Jury Verdict, Motion for New Trial, and*
       *Sentencing*

The People charged Zayas with murder (§ 187, subd. (a), count 1), shooting at an occupied vehicle (§ 246, count 2), and an unrelated count of being a felon in possession of a firearm (§ 29800, subd. (a)(1), count 3).  As to counts 1 and 2, the People alleged several firearm allegations (§ 12022.53, subds. (b), (c), (d) & (e)(1)).  For all counts, the People alleged a gang enhancement (§ 186.22, subd. (b)).  The People further alleged that Zayas had one prior serious or violent felony subject to the Three Strikes law (§§ 667, subds. (b)-(j), 1170.12).

Zayas's first trial ended in a mistrial due to a hung jury (11 to 1, guilty to not guilty).  Before the second trial, Zayas pleaded no contest to count 3, possession of a firearm by a felon.

The second jury found Zayas guilty of second degree murder (§ 187, subd. (a)) and found true that he personally used a firearm (§ 12022.53, subd. (b)), but found not true that he personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivisions (c) and (d).  The jury hung on count 2, shooting at an occupied vehicle.  The court declared a mistrial on count 2 and dismissed it.

In a bifurcated proceeding, the court dismissed the gang allegation on the People's motion.  The court also found true the allegation that Zayas had a prior strike conviction (§§ 667, subds. (b)-(j), 1170.12, subd. (b)).

The court sentenced Zayas to 30 years to life, consisting of 15 years to life on the murder count, doubled under the Three Strikes law.  For the firearm count, the court imposed and stayed one-third the middle term.  The court also stayed the sentence on the firearm allegation.

Zayas timely appealed.

## DISCUSSION

A.  *Substantial Evidence Supports the Conviction for Second Degree Murder*

Zayas contends there is insufficient evidence supporting his second degree murder conviction based on a theory of aiding and abetting express malice murder.  We disagree.

1.  *Applicable law and standard of review*

"Second degree murder is an unlawful killing with malice aforethought, but without the premeditation or deliberation required for first degree murder.  [Citation.]  Malice may be express or implied.  [Citation.]  Malice is express when a defendant intends to kill and implied when a defendant consciously disregards danger to human life." (*In re Ferrell* (2023) 14 Cal.5th 593, 600; see *People v. Knoller* (2007) 41 Cal.4th 139, 143, 151, 156-157; *People v. Gudiel* (2024) 107 Cal.App.5th 848, 859.)

" '[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts.' " (*People v. Hin* (2025) 17 Cal.5th 401, 455.)  "[A]ider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; accord, *Hin*, at p. 455; *People v. Diaz* (2026) 118 Cal.App.5th 545, 557.)  " ' "When the offense charged is a

9

specific intent crime, the accomplice must 'share the specific intent of the perpetrator.' " " ' " (*In re Lopez* (2023) 14 Cal.5th 562, 585.) Thus, to be guilty of directly aiding and abetting express malice murder, the aider and abettor must share the direct perpetrator's intent to kill. (*Id.* at pp. 585, 587.)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] This determination 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Cardenas* (2025) 18 Cal.5th 797, 821.)

We do not " ' "reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." [Citation.] The [judgment] should "be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the [fact finder] might have reached a different result had it believed other evidence." ' " (*People v. Helzer* (2024) 15 Cal.5th 622, 646; see *People v. Bolin* (1998) 18 Cal.4th 297, 331 [reversal for lack of substantial evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]' "].)

2. *Substantial evidence supported the conviction*

Zayas argues there is insufficient evidence that he shared Carrillo's intent to kill and that his acts assisted Carrillo in committing the murder. He specifically claims that "there was no evidence" of the following: that he "provided a weapon" to Carrillo, "pointed out the victim," knew Torres was in the vehicle, "yelled encouragement toward the shooter," or "harbored any malice" toward Torres.

By pointing to evidence that would support a contrary conclusion, Zayas misconstrues the substantial evidence standard of review. (See *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1379.) A defendant "does not show the evidence is insufficient by citing only his own evidence, or by arguing about what evidence is not in the record, or by portraying the evidence that is in the record in the light most favorable to himself." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) Rather, under the substantial evidence test, " 'we accept reasonable inferences in support of the judgment and do not consider whether contrary inferences may be made from the evidence.' " (*People v. Cunningham* (2016) 244 Cal.App.4th 1049, 1056; see *People v. Cuevas* (1995) 12 Cal.4th 252, 261 ["The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence" ' "].)

Reviewing the evidence in the light most favorable to the judgment, we conclude there was sufficient evidence to support Zayas's conviction. " 'Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).) The trial evidence establishes all these factors.

11

Starting with companionship, a reasonable trier of fact could conclude that Zayas and Carrillo were companions who shared a common purpose. They were both members of the East Side Wilmas gang and arrived in rival gang territory together. They walked together past the front door of Foc'sle Bar, toward the area where Torres was later shot, and into the bar. At some point later, they both left the bar and approached Torres, a rival gang member. After the shooting, they fled together in the same getaway car. Zayas thus "did not independently happen by the scene of the crime"—he and Carrillo took concerted steps together. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [substantial evidence of aiding and abetting where defendant and shooter together walked by the victims, decided to return to victims, and approached victims].) "Their concerted action reasonably implies a common purpose" to kill. (*Ibid.*; see *Nguyen*, *supra*, 61 Cal.4th at p. 1055 ["Although 'gang evidence standing alone cannot prove a defendant is an aider and abettor to a crime,' " it can strengthen inferences "arising from other evidence specific to defendant's role in the crime at issue"].)

Moreover, Zayas was present during every stage of the shooting. Although Zayas's " ' "mere presence alone at the scene of the crime is not sufficient to make [him] a participant," ' " his presence " ' "may be [a] circumstance[ ] that can be considered by the jury with the other evidence in passing on his guilt or innocence." ' " (*Nguyen*, *supra*, 61 Cal.4th at p. 1055.)

Zayas's conduct before and after the shooting also supports an inference of aiding and abetting. Before the shooting, Zayas went inside the bar and stayed for "just a few minutes." When he returned 34 minutes later with Carrillo, Zayas and Carrillo first walked past the area where the shooting would occur. A juror

12

could reasonably conclude from Zayas's initial conduct that he was surveilling the scene.  (See *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1066 ["the car drove by with both [shooter] and defendant before the shooting, implying they were surveilling" the home where victim was shot].)  Later, when Zayas was outside the bar with Campos, Zayas told Campos, " 'I don't think you should be out here.' "  Zayas's warning to Campos suggests that Zayas was aware of the impending shooting and acted to facilitate it by clearing the area of potential witnesses.  Further, Campos told the police that Zayas pointed a gun at Torres and then walked toward Torres's car.  By using a gun, Zayas "considered the possibility of a violent encounter."  (*People v. Lee* (2011) 51 Cal.4th 620, 636 [evidence defendant brought a loaded handgun "makes it ' "reasonable to infer that he considered the possibility of homicide from the outset" ' "].)

After the shooting, Zayas did nothing to help Torres and fled the scene with Carrillo.  (*People v. Lara* (2017) 9 Cal.App.5th 296, 322 [flight is relevant to whether a defendant aided and abetted the commission of the crime]; see also *People v. Bonilla* (2007) 41 Cal.4th 313, 329 [flight and failure to call for assistance imply consciousness of guilt].)  Further, after Zayas was arrested and charged with Torres's murder, he said, " 'I got a little sloppy,' " from which the jury could infer he was admitting his involvement in the murder.  Taken as a whole, the record contains substantial evidence from which the jury could have found beyond a reasonable doubt that Zayas knew of and shared Carrillo's intent to kill Torres and acted to further the shooting.

13

C.      *The Court Did Not Err in Admitting Detective Maffei's Testimony*

Zayas contends Maffei's testimony "was almost entirely inadmissible."  In particular, he claims Maffei improperly (1) identified Zayas on the surveillance video, (2) opined about the shooter's location, and (3) testified as an improper "overview witness" by summarizing the prosecution's case instead of providing first-hand observations.[7]

Zayas acknowledges his trial counsel failed to object to Maffei's testimony during trial.  By failing to object, Zayas forfeited his claims on appeal.  (Evid. Code, § 353; *People v. Flinner* (2020) 10 Cal.5th 686, 726 ["it is still generally the case that a defendant forfeits an argument on appeal where he fails to object at all to the evidence in the trial court"]; *People v. Partida* (2005) 37 Cal.4th 428, 433-434 [" ' "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable' "].)  Even assuming Zayas did not forfeit his claims, his arguments also fail on the merits.

1.      *Identification of Zayas in the video*

Zayas argues the trial court erred when it allowed Maffei to identify him as the person shown on the surveillance video from

---

[7]      In Zayas's opening brief, one of his headings alleges that Maffei improperly opined about muzzle flashes.  However, Zayas did not otherwise discuss the issue, and we deem that argument forfeited.  (See *People v. Benson* (2025) 110 Cal.App.5th 1068, 1078, fn. 2 [" ' "[T]o demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record."  [Citation.]  "We are not obliged to make other arguments for [appellant] [citation], nor are we obliged to speculate about which issues counsel intend to raise." ' "].)

14

Foc'sle Bar because Maffei was "unable to identify [him] without help from third parties" and did not know what he looked like "prior to [his] arrest."

During Maffei's testimony, the prosecutor played a portion of the surveillance video from Foc'sle Bar. As the video played, she asked Maffei whether he could identify two people in the video. Maffei said he could identify Zayas and Carrillo and pointed to what each person was wearing. The prosecutor also asked Maffei, "And from watching the video, were you able to make any identifications, just you, yourself?" Maffei testified that he could identify Carrillo in the video, but he had to use "other resources" to identify Zayas.

Maffei specifically explained that he reached out to Martinez for assistance because Martinez was familiar with the area surrounding Foc'sle bar and had conducted a traffic stop of Carrillo in June 2018, a few months before the murder. Maffei showed Martinez a clip of the surveillance video "to see if he could identify anybody that was involved in that traffic stop, or who may be friends with Carrillo." Martinez was able to identify Zayas because Zayas was present with Carrillo at the June 2018 traffic stop. Maffei also reviewed the body-worn camera footage from Martinez's traffic stop and "was able to look at that video, and for [himself], also determined that [Zayas] was the person in the video." Later in his testimony, Maffei stated that he had personal contact with Zayas: he interacted with Zayas during his arrest in July 2019, nine months after the murder, and spoke to Zayas "at length."

A lay witness may offer opinion testimony if it is "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of [the witness's] testimony."

15

(Evid. Code, § 800.) " '[T]he identity of a person is a proper subject of nonexpert opinion,' " and "Court of Appeal decisions have long upheld admission of testimony identifying defendants in surveillance footage or photographs." (*People v. Leon* (2015) 61 Cal.4th 569, 601 (*Leon*).)

Historically, courts have identified "two predicates for the admissibility of lay opinion testimony as to the identity of persons depicted in surveillance photographs [or video]." (*People v. Mixon* (1982) 129 Cal.App.3d 118, 128.) First, the witness must "testify from personal knowledge of the defendant's appearance at or before the time the [video] was taken." (*Ibid*.) Second, the witness's testimony must "aid the trier of fact in determining the crucial identity issue."[8] (*Ibid*.)

However, recent cases have extended the scope of the first predicate. As relevant here, a witness need not have been personally familiar with the defendant *prior* to the crime to make an identification from surveillance video. (*Leon*, *supra*, 61 Cal.4th at p. 601 [it was proper for detective to identify defendant in surveillance video based on detective's testimony that he first saw defendant when he was arrested, he subsequently spent two hours with defendant, and he "was 'very' familiar with defendant's appearance"].) Further, under certain circumstances, a witness may properly identify a defendant in a surveillance video even if that witness had no personal knowledge of the defendant. (*People v. Larkins* (2011) 199 Cal.App.4th 1059, 1067-1068 [loss prevention officer was properly allowed to identify defendant in a surveillance video

---

[8]     Zayas challenges only the first predicate—whether Maffei had adequate knowledge of his appearance.

16

because the officer had watched 20 to 30 other videos showing the defendant, "during which time [the officer] could observe such distinguishing characteristics as defendant's posture, gait and body movements"].)

"Questions about the extent of [the witness's] familiarity with [a] defendant's appearance [go] to the weight, not the admissibility, of [the witness's] testimony." (*Leon*, *supra*, 61 Cal.4th at p. 601.) We review a trial court's ruling to admit a lay identification opinion for abuse of discretion. (*Id.* at p. 600.)

The court did not abuse its discretion in admitting Maffei's testimony. Although Maffei initially relied on Martinez to identify Zayas in the video, Maffei subsequently conducted his own independent assessment. Maffei reviewed Martinez's body-worn camera footage, wherein Zayas is undisputably identified. Maffei was therefore "sufficiently familiar" with Zayas's appearance "to later identify him in the same or another medium." (*People v. Larkins*, *supra*, 199 Cal.App.4th at p. 1068 ["One can be sufficiently familiar with a person by seeing photos of him to later identify him in the same or another medium. We do not doubt that a starstruck young lady who has seen pictures of Justin Bieber in magazines could easily identify him were she to see him on a video, on television or in person."].)

Also, Maffei later acquired personal knowledge of Zayas's appearance during Zayas's arrest. It "is a distinction without a difference" that Maffei did not have personal contact with Zayas *before* the murder. (*Leon*, *supra*, 61 Cal.4th at p. 601.) Taken together, Maffei had two sources of familiarity with Zayas's appearance: videos and a personal encounter. Any questions regarding Maffei's familiarity with Zayas "went to the weight, not the admissibility, of his testimony." (*Ibid.*) And "because the

17

surveillance video was played for the jury, jurors could make up their own minds about whether the person shown was defendant." (*Ibid.*) The court thus did not abuse its discretion.[9]

2. *Opinion about the shooter's location*

Zayas contends the trial court erred when it allowed Maffei to testify about the location of the shooter because Maffei's opinion was inadmissible expert opinion. We disagree and conclude Maffei's opinion was admissible as lay opinion testimony.

---

[9] Zayas also briefly argues that Maffei improperly identified Campos, Hernandez, and Salvador Garibay from the surveillance video. Zayas claims Maffei "never met" Campos. Zayas is incorrect. Maffei met Campos in person on two different occasions and interviewed her both times. During the interview, Campos admitted that she was " 'on the video.' " Thus, the court did not abuse its discretion. (See *Leon, supra*, 61 Cal.4th at p. 601.)

As to Hernandez and Garibay, Maffei identified Hernandez as the driver of the SUV getaway car and Garibay as one of the passengers, but Maffei did not explain how he was able to identify them. Even assuming it was error to admit this testimony (had there been a timely objection), Zayas has failed to demonstrate a reasonable probability the jury would have reached a more favorable verdict if the trial court had excluded the testimony. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 131 [applying state law standard claim of erroneous admission of opinion testimony].) The identity of Hernandez and Garibay did not add anything substantive to the prosecutor's case. Indeed, the prosecutor did not emphasize their identities in opening or closing argument. Had the prosecutor referred to them as "the driver" and "the passenger" of the SUV, the result would have been the same.

18

Maffei testified that, sometime after the shooting, he took measurements of the sidewalk where the shooting occurred. Specifically, he measured the length between two points: the electrical box on the sidewalk and the area where the passenger window of Torres's car would have been. To determine where the window of Torres's car would have been, Maffei looked at a photograph from the crime scene. In the photograph, Torres's car was in front of a "block wall." Maffei counted the blocks on the wall to conclude the opening of the window was "four blocks" over. He then measured from that point to the electrical box, concluding the distance was 28 feet.

Expert and lay opinion play "very different role[s]" and are "subject to different rules of admissibility." (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547 (*Chapple*).) A properly qualified expert may offer an opinion, based on his or her "special knowledge, skill, experience training, [or] education," that is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subds. (a), (b); see *Chapple*, at p. 546.) " 'Expert opinion is not admissible if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness.' " (*Chapple*, at pp. 546-547.) "[T]he purpose of expert testimony, to provide an opinion beyond common experience, dictates that the witness possess uncommon, specialized knowledge." (*Id*. at p. 547.)

In contrast, a lay witness can testify in the form of an opinion if the opinion is both "[r]ationally based on the perception of the witness" and "[h]elpful to a clear understanding of [the witness's] testimony." (Evid. Code, § 800.) " ' "Lay opinion testimony is admissible where no particular scientific knowledge

19

is required." ' " (*Chapple, supra,* 138 Cal.App.4th at p. 547.)  "For example, testimony that another person was intoxicated [citation] or angry [citation] or driving a motor vehicle at an excessive speed" is admissible as lay opinion.  (*Ibid.*)  "[U]nlike an expert opinion, the subject matter of lay opinion is 'one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness,' and requires no specialized background."  (*Ibid.*)  On appeal, a court's admission of lay opinion testimony is reviewed for abuse of discretion.  (*People v. Thompson* (2010) 49 Cal.4th 79, 128.)

Zayas argues that Maffei "purport[ed] to use some sort of scientific method to identify the exact location of the shooter," and Maffei's testimony was admitted without proper foundation as an expert.  But Maffei did not apply any sort of scientific expertise to reach his conclusion that the distance between the electrical box on the sidewalk and Torres's passenger window was 28 feet.  Instead, his opinion was rationally based on his personal observation of a photograph from the crime scene.  Maffei looked at the photograph, identified visual markers, and measured from those markers.  (See *People v. Lewis* (2008) 43 Cal.4th 415, 504, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919 [detective's testimony that the shotgun shells exhibited strike marks, indicating a failed attempt to fire, was rationally based on his visual perception of the shells].)  The subject of his opinion—the location of the window and the distance between the window and the electrical box—was also not so far "beyond the common experience" that expert testimony was required.  (See *People v. Helm* (1907) 152 Cal. 532, 547, disapproved on another ground in *People v. Edwards* (1912) 163 Cal. 752, 756 [it is "well-settled … that a person may give his

20

opinion on the question of identity, or his judgment of size, weight, color, quantity, distance, and time, matters of opinion open to all men of ordinary information"].)

Zayas also questions the strength of Maffei's testimony. He argues, "The witness never measured the height of the curb or the driveway the vehicle was parked on. The witness never determined the height of the defendants. … How does [Maffei] know if the vehicle rolled forward or was put in reverse?" Zayas's argument is misplaced because it relates to the weight of the evidence, not the admissibility. Because Maffei properly testified as a lay witness, the court did not abuse its discretion in admitting Maffei's testimony.

3. *Overview witness*

Zayas argues Maffei acted as an improper "overview witness" because he summarized the prosecution's case instead of offering his first-hand observations. He relies on *People v. Rouston* (2024) 99 Cal.App.5th 997 (*Rouston*), the only California case to address the issue.

In *Rouston*, the defendant made the same argument about a detective who had testified in the case. (*Rouston*, *supra*, 99 Cal.App.5th at p. 1014.) To support his argument, the defendant cited "federal case law, where the circuit courts have defined an overview witness as 'a government agent who testifies in a criminal matter as the prosecution's first witness (or at least as one of its earliest witnesses) and provides an overview of the prosecution's case to come.' " (*Ibid.*, citing *United States v. Brown* (1st Cir. 2012) 669 F.3d 10, 24.) "Federal courts have described this type of testimony as 'inherently problematic' because '(1) the jury could be influenced by statements of facts and credibility determinations not in evidence; (2) later testimony could be

21

different from what the overview witness assumed; and (3) the jury may place greater weight on evidence that they perceive has the imprimatur of the government.' " (*Rouston*, at pp. 1014-1015; see *United States v. Agramonte-Quezada* (1st Cir. 2022) 30 F.4th 1, 19 [" 'Testimony by a law enforcement agent constitutes impermissible "overview" testimony when it effectively opines that a defendant is guilty "based on the totality of information gathered" in the agent's investigation, rather than relaying the agent's first-hand experiences and observations.' "].) An overview witness " 'who testif[ies] at the end of the government's case instead of the beginning,' similarly creates 'the possibility that the credibility of the summary witness may be substituted for the credibility of the evidence summarized.' " (*Rouston*, at p. 1015.)

The court in *Rouston* noted that the detective's testimony "was problematic for the same reasons as that of an overview witness." (*Rouston, supra*, 99 Cal.App.5th at p. 1015.) The detective "was called to the stand several times to summarize or opine on the testimony of other prosecution witnesses." (*Id.* at p. 1005.) As the court explained, the problem with his summary testimony was that "[t]he jury likely placed significant weight on the statements of the lead detective in the case summarizing the testimony of the other witnesses, and possibly substituted the credibility of [the detective] for that of the percipient witnesses." (*Id.* at p. 1015.)

Zayas does not cite to the record where Maffei allegedly acted as an overview witness. He has thus forfeited his argument. (See *People v. Hoyt* (2020) 8 Cal.5th 892, 939 (*Hoyt*) ["by failing to support his appellate arguments with record citations, defendant has forfeited any claim of error on appeal"]; *People v. Weber* (2013) 217 Cal.App.4th 1041, 1055 [defendant

22

forfeited an argument by failing to provide a record citation for a statement he claimed occurred during the trial]; *People v. Mendoza* (1986) 183 Cal.App.3d 390, 398 [" '[A] point suggested on appeal cannot be considered where the brief fails ... to point out the page of the record where the alleged error is supposed to have occurred.' "].)

Even if Zayas had not forfeited it, his contention is meritless. It appears Zayas challenges only instances where Maffei described what occurred in the surveillance video from Foc'sle Bar. This was not improper overview witness testimony. Maffei did not summarize the testimony of other witnesses; rather, he summarized what he saw on the video. Maffei testified that he spent "[s]everal hours" watching the video "in order to put pieces together." Maffei told the jury the duration of the time lapses in the video, what people were doing, and what cars were doing. Maffei did not testify as an overview witness.

D.  *Zayas Has Not Shown Any Prosecutorial Misconduct*

Zayas contends the prosecutor engaged in prejudicial misconduct by improperly describing Campos, mischaracterizing the evidence, and misstating the law. At trial, Zayas did not object on these grounds. " ' "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." ' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 657.) " 'The lack of a timely objection and request for admonition will be excused only if either would have been futile or if an admonition would not have cured the harm.' " (*Hoyt*, *supra*, 8 Cal.5th at pp. 942-943; accord, *People v. Powell* (2018) 6 Cal.5th 136, 171.) Zayas does not contend his

failure to object should be excused; thus, we conclude he forfeited his contentions on appeal.  In any event, they also fail on the merits.

  1. *Applicable law and standard of review*

  " ' " " 'A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it "infects the trial with such unfairness as to make the conviction a denial of due process."  [Citations.]  In other words, the misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*Hoyt*, *supra*, 8 Cal.5th at p. 943.)

  " 'When attacking the prosecutor's remarks to the jury, the defendant must show' that in the context of the whole argument and the instructions there was ' "a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner." ' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 306.)  "Although we generally review claims of prosecutorial error for an abuse of discretion [citation], we independently examine what the law is [citation] and 'objective[ly]' examine how a 'reasonable juror' would likely interpret the prosecutor's remarks [citations], bearing in mind that ' "we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." ' " (*People v. Collins* (2021) 65 Cal.App.5th 333, 340.)

2.	*The prosecutor's statement about Campos*

Zayas challenges the prosecutor's description of Campos in her opening statement. The prosecutor told the jury, "I've mentioned you will hear more about … Campos. So, at a prior proceeding, she testified. Unfortunately, she has since passed away. Nothing related to this case. She died of a drug overdose." Zayas contends the prosecutor "knew (or at least should have known) with an absolute certainty that no Court would have possibly allowed that testimony in front of the jury." Zayas does not present any cogent argument or cite to any legal authority for his contention; therefore, we conclude his contention is forfeited. (See *People v. Williams* (1997) 16 Cal.4th 153, 206 ["Points 'perfunctorily asserted without argument in support' are not properly raised."]; *People v. Hardy* (1992) 2 Cal.4th 86, 150 [defendant forfeited an argument by failing to "expand on the issue with either argument or citation to relevant authority"]; *People v. Lewis* (2025) 111 Cal.App.5th 1078, 1098 ["absence of cogent legal argument" forfeits the issue on appeal]; *People v. Ramirez* (2024) 104 Cal.App.5th 315, 329-330 [defendant forfeited an argument by not citing "any relevant legal authority to support this claim" or "develop[ing] a cogent legal argument"].)

In any event, the contention lacks merit. " '[R]emarks made in an opening statement cannot be charged as misconduct unless the evidence referred to by the prosecutor "was 'so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted.' " ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 762.) We cannot say the evidence here about Campos's unavailability " ' "was 'so patently inadmissible.' " ' " (*Ibid*.) There is no evidence that the prosecutor told the jury incorrect information. Indeed, the parties later stipulated that

25

Campos was unavailable to testify because she died of a drug overdose. Further, the prosecutor was entitled to explain why Campos was unavailable to prevent the jury from drawing a negative inference from her failure to testify. (See *People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554 [jurors may draw a negative inference when a witness refuses to testify and has no right to do so].) Thus, the prosecutor did not commit misconduct in the opening statement.

3. *The prosecutor's alleged mischaracterizations of evidence*

Zayas contends the prosecutor mischaracterized evidence during closing arguments. The prosecutor told the jury to watch the surveillance video from Foc'sle Bar and look at Zayas's "right pocket" as he walked toward the getaway car. The prosecutor continued: "There is a black object in the pocket, and I'm going to ask you to take a look." The prosecutor also told the jury to watch Campos in the video. The prosecutor argued, "She was in the doorway. She was able to see when [Zayas] pulled out the gun and started walking" toward Torres. The prosecutor also argued that during Campos's interview, Campos "put the gun in [Zayas's] hand," and she was focused on the gun, not whether had tattoos.

Zayas claims that the prosecutor committed misconduct when she argued that the video showed Zayas had a "black object" in his hand, that Campos saw Zayas with a gun in his hand, and that Campos was only focused on the gun. Zayas contends it was misconduct because "[t]here was literally not a single word of testimony" supporting the prosecutor's arguments. We disagree.

26

"It is misconduct for a prosecuting attorney to argue beyond the record by stating facts not in evidence. [Citations.] An advocate who does so is essentially offering unsworn testimony not subject to cross-examination. [Citation.] 'However, the prosecution "enjoys wide latitude in commenting on the evidence, including the reasonable inferences and deductions that can be drawn therefrom." ' " (*People v. Nadey* (2024) 16 Cal.5th 102, 188 (*Nadey*).)

The video evidence from Foc'sle Bar captured Zayas's clothing and showed Zayas walking toward the getaway car. The prosecutor thus had " ' "wide latitude" ' " to remark on this state of evidence and make inferences about Zayas's clothing. (*Nadey*, *supra*, 16 Cal.5th at p. 188.) Indeed, defense counsel conceded during closing argument that the jury would "see things that [they] think might be something in multiple people's pockets." Thus, the prosecutor's statement about a "black object" in his pocket was a fair comment on the evidence.

Additionally, given the testimony and video evidence, the prosecutor's comments about Campos were proper. Campos told Maffei that Zayas looked like the man who walked toward Torres's car with a gun in his hand. Campos also said she "wasn't really paying attention" to whether the man had tattoos. The video footage was consistent with Campos's statements in that it showed her outside the bar, "facing the direction that … Zayas [wa]s walking." Based on this evidence, it was reasonable for the prosecutor to infer that Campos saw Zayas with a gun in his hand and was only focused on the gun. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1342 [the prosecutor " 'has the right to fully state [her] views as to what the evidence shows and to urge whatever conclusions [she] deems proper' "].) Zayas "may

not complain on appeal if the reasoning is faulty or the conclusions are illogical because these are matters for the jury to determine." (*Ibid.*)

4. *The prosecutor's statements of law*

Zayas contends the prosecutor misstated the law on aiding and abetting during closing argument because she failed to tell the jury "that a specific intent to kill must be present." Specifically, Zayas claims the prosecutor committed misconduct when she said, " 'Aiding and abetting is just helping somebody to commit the crime.' " Zayas also challenges the prosecutor's analogies to sports.

During closing argument, the prosecutor stated, "A defendant aids and abets if the defendant knows the shooter's unlawful purpose and aids, facilitates, promotes, encourages, or instigates the shooter's commission of the crime. Basically, helps him to commit the crime. … Aiding and abetting is just helping somebody commit the crime." The prosecutor then analogized aiding and abetting to basketball, baseball, and football. In her basketball comparison, the prosecutor said that "the person who … scores … gets some sort of stats for it, but so does the person who assists. The person who throws the ball to the one who then shoots actually gets their stats as well, because they've assisted the shooter in making the basket." The prosecutor made similar arguments for baseball and football, concluding, "It's all the same. It's about helping someone, helping them to do or commit the crime or to score the goal, or whatever it may be."

During rebuttal, the prosecutor discussed the instructions, stating, "The aiding and abetting instruction, you have that. It's going to be [CALCRIM No.] 401, that's the instruction." The prosecutor also told the jury that "you don't have to agree on the

28

theory of liability.  You don't have to agree on that, but you do have to agree that he had that intent to kill, whether it was in helping … Carrillo … or being an aider and abettor."

" '[I]t is improper for the prosecutor to misstate the law generally.' " (*People v. Cortez* (2016) 63 Cal.4th 101, 130.)  "But a prosecutor is allowed to vigorously argue the case and is afforded 'significant leeway' in discussing the facts and the law in closing argument." (*People v. Azcona* (2020) 58 Cal.App.5th 504, 516.) "Thus, 'comments drawn from common experience, history, or literature' are generally permissible [citation], as are quotations from books or other sources presented for illustrative purposes." (*Nadey*, *supra*, 16 Cal.5th at p. 188.)

We need not decide whether the prosecutor's comments were misstatements of the law because Zayas has failed to show a " ' "reasonable likelihood" ' " the jury understood or applied the prosecutor's remarks in an improper manner.  (*People v. Silveria and Travis*, *supra*, 10 Cal.5th at p. 306.)  The prosecutor's challenged comments were brief, and the prosecutor referred the jury to the instruction (CALCRIM 401) on aiding and abetting. The prosecutor also ultimately told the jury that they had "to agree that [Zayas] had [the] intent to kill."

In addition, there is no dispute that the trial court accurately instructed the jury on the law of aiding and abetting. Moreover, the trial court instructed the jury, "If you believe that the lawyers' comments on the law conflict with the instructions, you must follow my instructions."  We must presume jurors followed that instruction.  (*People v. Centeno* (2014) 60 Cal.4th 659, 676 [" 'When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former, for "[w]e presume that jurors treat

the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade." ' "].)  Accordingly, we conclude Zayas failed to meet his burden of proving prosecutorial misconduct.  (See *People v. Potts* (2019) 6 Cal.5th 1012, 1037-1038 [where the prosecutor's challenged remarks "were brief" and referred jurors to the court's instructions, and the court correctly instructed the jury, it was "not reasonably likely the jury construed the remarks in an objectionable fashion, nor that 'the jury understood the instructions to allow conviction based on' inadequate proof"]; *People v. Cortez* (2016) 63 Cal.4th 101, 133-134 ["no reasonable likelihood" the jury misconstrued or misapplied the prosecutor's challenged remarks where the comments "were brief and constituted a tiny, isolated part of the prosecution's argument," the prosecutor referred jurors to the jury instruction, and the court properly instructed on the law].)

E.    *Defense Counsel Did Not Provide Ineffective Assistance of Counsel*

Zayas condemns the quality of defense counsel's opening statement and closing argument.  He argues counsel was incompetent because he conceded that Zayas was present at the crime scene, that the flashes on the surveillance video were muzzle flashes (as opposed to glitches on the surveillance video), and that Campos was a drug addict who made contradictory statements and later died of an overdose.  We reject the arguments.

1.    *Applicable law and standard of review*

" ' "To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing

30

professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.  [Citation.]  'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' " (*People v. Rices* (2017) 4 Cal.5th 49, 80; accord, *People v. Johnson* (2016) 62 Cal.4th 600, 653; *In re Roberts* (2003) 29 Cal.4th 726, 744-745; see *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of professional assistance." ' [Citations.]  '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926; accord, *People v. Ledesma* (2006) 39 Cal.4th 641, 746.)  Accordingly, to prevail on a claim that counsel's performance fell below an objective standard of reasonableness, a defendant must show "counsel had ' " 'no rational tactical purpose' " ' for an action or omission." (*People v. Mickel* (2016) 2 Cal.5th 181, 198.)  " ' " '[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." ' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 982.)

31

## 2. *Defense counsel was not deficient*

During opening statement, defense counsel told the jury that video from Foc'sle Bar would show Carrillo and Zayas walked toward Torres's car before there were gunshots. Counsel also stated the jury would hear evidence that Campos "was in the middle of a three-day drug bender" on the night of the shooting and later died from an overdose.

During his closing argument, defense counsel argued that Zayas was "not guilty" of murder because he was not the shooter and did not aid and abet the shooting. Counsel conceded that Zayas was at Foc'sle Bar on the night of the shooting and walked toward Torres's car "right before the muzzle flashes." But, counsel argued, Zayas's mere presence at the scene was not enough to convict him. Counsel pointed to the "lack of hard evidence" of guilt, including the lack of "usable forensic evidence, such as DNA or prints." Counsel also argued that the video was "not clear," the video did not show a gun, and Carrillo was "the more likely shooter." In discussing Campos, counsel acknowledged that Campos testified Zayas "had a gun," but counsel argued that Campos "said contradictory things," was high when she testified, was an addict who died of an overdose, and was not "a reliable source."

Defense counsel does not necessarily render ineffective assistance of counsel by conceding various facts or even degrees of guilt.[10] (*Yarborough v. Gentry* (2003) 540 U.S. 1, 9 [concession

---

[10] Zayas also claims defense counsel violated his Sixth Amendment right of autonomy over the defense under *McCoy v. Louisiana* (2018) 584 U.S. 414. "Because a client's autonomy, not counsel's competence, is in issue," the "ineffective-assistance-of-

that defendant was a " 'bad person, lousy drug addict, stinking thief, jail bird' " was not an unreasonable because "[b]y candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case"]; *People v. Samayoa* (1997) 15 Cal.4th

---

counsel jurisprudence" does not apply to such a claim. (*Id.* at p. 426.) Rather, to demonstrate error under *McCoy*, the defendant must show defense counsel conceded the defendant's guilt and the concession was over the defendant's "intransigent and unambiguous objection." (*Id.* at p. 420; see *People v. Chhuon* (June 1, 2026, S105403) __ Cal.5th __ [2026 WL 1530451, *12-14 [*McCoy* violation where counsel conceded guilt for second degree murder despite defendant's "express wish to maintain his innocence"]; *People v. Bloom* (2022) 12 Cal.5th 1008, 1015 [same where counsel conceded guilt for two of three murder counts despite defendant's objection]; *People v. Flores* (2019) 34 Cal.App.5th 270, 280-283 [same where counsel conceded actus reus of crime despite defendant's objection].) If the defendant makes such a showing, the error is structural. (*Chhuon*, at p. __ [2026 WL 1530451, *14]; *McCoy*, at p. 427.) Zayas failed to make either showing. Counsel conceded various facts, not guilt or elements of the crime. Also, there is no evidence that Zayas objected to counsel's strategy. The record contains a declaration from Zayas stating, "I did not give my trial counsel permission to implicate me at the scene." This is not evidence of an active, express objection. (Cf. *Chhuon*, at p. __ [2026 WL 1530451, *11] [after closing arguments, defendant wrote a letter to the judge saying he told his lawyer " 'not to claim any guilt on my behalf which he failed to do' "]; *Bloom*, at p. 1036 [defendant "made known his discontent … numerous times" at pretrial hearings; there was "nothing genuinely ambiguous about his expressed desire to maintain innocence"]; *Flores*, at p. 280 [defendant made "express and unambiguous" objection during pretrial proceedings].)

795, 846-847 [concession that defendant was guilty of first degree murder under a felony-murder theory was not unreasonable where evidence was overwhelming and "defense counsel reasonably may have determined that the only viable theory of defense was that defendant had lacked the intent to kill," an element that was required for each of the three alleged special circumstances]; *People v. Freeman* (1994) 8 Cal.4th 450, 498 ["Recognizing the importance of maintaining credibility before the jury, we have repeatedly rejected claims that counsel was ineffective in conceding various degrees of guilt."]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1186-1187, superseded by statute on another ground as stated in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106 [concession that defendant was present at the crime scene was not unreasonable where the evidence was strong and counsel had "to make the best of a bad situation"].) Where the incriminating evidence is strong and counsel offers "some other choice in the defendant's favor," an ineffective assistance claim may be rejected. (*People v. Hart* (1999) 20 Cal.4th 546, 631.)

Zayas has failed to overcome the strong presumption that counsel's strategy fell within "the wide range of reasonable professional assistance." (*Strickland v. Washington, supra*, 466 U.S. at p. 689.) There are reasonable tactical explanations for why counsel made concessions regarding Zayas's presence, the muzzle flashes, and Campos.

First, there was strong evidence that Zayas was present at the scene. Both Maffei and Martinez identified Zayas in the surveillance video from Foc'sle Bar. Campos said Zayas looked like the person who lit her cigarette, pointed a gun at Torres, and walked toward Torres's car. Further, Zayas's jail phone call,

34

where he said, "I got a little sloppy," suggested he was involved in the crime and had made mistakes. Given this evidence, it was not unreasonable for counsel to concede Zayas's presence. (See *McPeters*, *supra*, 2 Cal.4th at pp. 1186-1187 [where eyewitnesses and other evidence placed defendant at the scene, counsel was not deficient for conceding defendant's presence].) That's because "candor may be the most effective tool available to counsel." (*People v. Mayfield* (1993) 5 Cal.4th 142, 177.) By candidly conceding Zayas's presence, defense counsel may have built credibility with the jury and persuaded it to focus on his other arguments. (See *Yarborough v. Gentry*, *supra*, 540 U.S. at pp. 9-10 [" '[I]f you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate.' "]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1060-1061 ["good trial tactics often demand complete candor with the jury, and ... in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding sweeping declarations of his or her client's innocence"].)

Second, there was also strong evidence that the flashing lights near Torres's car seen in the surveillance video were gunfire. Maffei testified that, based on his familiarity with firearms, the flashing lights were muzzle flashes. Daniel Rubin, a LAPD criminalist, similarly testified. Additionally, forensic evidence demonstrated the shooting occurred very close to Torres's car. Based on the weight of the evidence, it was not unreasonable for counsel to concede the flashes were gunfire and focus his argument on the lack of evidence Zayas was the shooter. (See *People v. Hart*, *supra*, 20 Cal.4th at p. 631 ["In view of the

evidence presented against defendant, trial counsel reasonably could have concluded that challenging the evidence more vigorously in his argument risked alienating the jury and perhaps lessening his odds of success"]; *People v. Mitcham*, *supra*, 1 Cal.4th at p. 1060 [by conceding intent, counsel was able to focus his defense on other arguments].)

Lastly, regarding defense counsel's remarks about Campos being a drug addict, Zayas contends counsel's strategy was ineffective because Campos's testimony "completely exonerated" him. He is incorrect. Campos was the only eyewitness to the murder, and her testimony was damaging to Zayas's case. Campos testified that on the night of the shooting, she stepped outside Foc'sle Bar for a cigarette and a man standing outside who "look[ed] like" Zayas lit it for her. The man told Campos, " 'I don't think you should be out here right now,' " which indicated he knew something bad was going to happen. According to Campos, after he made that statement, the man approached Torres's car parked nearby, at which point the man pointed a gun at Torres, "cocked" the gun, put the gun down, and then walked up to Torres's car. Within seconds, Campos heard four or five gunshots. Given Campos's incriminating testimony, it was reasonable for counsel to highlight her drug history and inconsistent statements. Counsel's strategy conceivably could have persuaded the jury to disregard her testimony because her conduct tended to cast doubt on her credibility. (See Evid. Code, § 780 [in determining the credibility of a witness, jury may consider any matter that has a tendency in reason to prove or disprove the truthfulness of her testimony, including "[t]he extent of [her] capacity to perceive, to recollect, or to communicate any

36

matter about which [she] testifies" and "[a] statement made by [her] that is inconsistent"].)

Far from there being no possible satisfactory explanation for defense counsel's conduct (*People v. Carrasco*, *supra*, 59 Cal.4th at p. 982), there were obvious tactical reasons counsel made the concessions regarding Zayas's presence, the muzzle flashes, and Campos. Zayas failed to demonstrate ineffective assistance of counsel.

## F.    *There Was No Cumulative Error*

Zayas argues the cumulative effect of the claimed errors was prejudicial and deprived him of a fair trial. "Cumulative error is present when the combined effect of the trial court's errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) "We have either found no error or, in those instances where error has been ... assumed, no prejudice. Thus, there is no prejudice to accumulate." (*People v. Williams* (2015) 61 Cal.4th 1244, 1291.)

## G.    *The Trial Court Did Not Err in Denying Zayas's Motion Under the Racial Justice Act*

### 1.    *Relevant proceedings*

After the jury returned its verdict, Zayas filed a motion for a new trial alleging, among other issues, a violation of the Racial Justice Act (RJA, § 745). In his motion, Zayas did not cite the RJA, identify which category of conduct occurred, or attach any supporting documents, making it difficult to discern his specific argument. It appears he relied on the trial testimony of Martinez to argue that a particular traffic stop "was a completely illegal search and seizure" and was "violative of every RJA." Martinez testified about two traffic stops—one in June 2018 and another in

December 2018.  It is not clear from Zayas's motion which stop he challenged.

Relevant here, Martinez testified that after he reviewed the surveillance video from Foc'sle Bar, he was able to identify Carrillo and Zayas.  He was familiar with them because he encountered them during a traffic stop on June 13, 2018.  There was no further testimony about the details of the June 2018 traffic stop.

Martinez also testified that in December 2018, two months after the murder, he was looking for cars "that were connected to any criminal activity."  He stopped a car for a traffic violation and noticed that the car "matched the vehicle in this case."  He took pictures of the car and the driver, whom he identified as Hernandez.  There were no passengers in the car.  Later, Martinez determined that Hernandez was in the surveillance video from Foc'sle Bar by comparing photos from the traffic stop with the video.

Based on this testimony, Zayas argued in his motion for a new trial that "Officer Martinez pulled over the vehicle for the specific purpose of further investigation concerning the shooting of Mr. Torres.  [¶]  There was no probable cause to search or photograph the occupants.  This was a completely illegal search and seizure that far exceeded the time necessary to issue a ticket or citation.  Pulling over Hispanic men who drive an unremarkable vehicle to investigate is violative of every RJA and the Constitution."

The People opposed the motion.  They argued that Zayas's allegations failed to make a prima facie showing of a violation of

38

the RJA.[11]  In particular, they argued that Zayas "was not present at the traffic stop" of Hernandez, and Zayas could not "bring an RJA claim on behalf of another individual." Additionally, they argued Zayas "fail[ed] to articulate facts to support any bias or animas towards [Zayas] because of his race, ethnicity or national origin."

Zayas filed a reply clarifying that his claim was based on section 745, subdivision (a)(1).  He argued that "[t]he fact that [he] was not driving the vehicle does not preclude him from making a claim that the stop was pretextual or that the officers' actions toward [him] following the stop violated the Act."  He also cited the 2023 and 2024 reports from the California Racial and Identity Profiling Advisory Board (RIPA) to demonstrate that " 'Hispanic/Latine(x)' individuals represented a higher proportion of stopped individuals than their relative proportion of the weighted California residential population."

At the hearing on the RJA motion, the trial court asked defense counsel to clarify which traffic stop he was challenging. Defense counsel stated that he was challenging the June 2018 traffic stop of Carrillo because "[i]t was a racially motivated stop." Counsel did not call any witnesses or offer any new evidence at the hearing.

The trial court found Zayas failed to make a prima facie showing there was a violation of the RJA.  The court ruled that besides the RIPA statistical reports, there was no "specific evidence to further [Zayas's] argument."

---

[11]    They also argued that the motion was untimely.  The People do not raise that argument again on appeal.

2. *Applicable law and standard of review*

" '[T]he RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin.' " (*People v. Chhuon* (June 1, 2026, S105403) __ Cal.5th __ [2026 WL 1530451, *33]; see *People v. Demolle* (June 1, 2026, S159120) __ Cal.5th __ [2026 WL 1530658, *46]; § 745, subd. (a).) It specifies four categories of conduct, any one of which, if proven by a preponderance of the evidence, establishes a violation. (§ 745, subd. (a)(1)-(4).) The first of those categories is relevant here. Specifically, a violation exists when "(1) [t]he judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." (*Id.*, subd. (a)(1).)

"When a defendant files a motion in the trial court alleging a violation of the Racial Justice Act, the first step is for the trial court to determine whether the defendant has made 'a prima facie showing of a violation.' [Citation.] The statute specifically defines ' "[p]rima facie showing" ' to mean 'that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred.' [Citation.] The statute further states that 'a "substantial likelihood" requires more than a mere possibility, but less than a standard of more likely than not.' [Citation.] Moreover, 'a defendant seeking relief under the [RJA] must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim. The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are

40

conclusory, unsupported by the evidence presented in support of the claim, or demonstrably contradicted by the court's own records. ... [T]he court should not make credibility determinations at the prima facie stage.' " (*Jackson v. Superior Court* (2025) 109 Cal.App.5th 372, 381 (*Jackson*); see *Mosby v. Superior Court* (2024) 99 Cal.App.5th 106, 131; *Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 23.)

"Once a defendant makes a prima facie showing, the trial court proceeds to determine whether the defendant has met 'the burden of proving a violation of subdivision (a) [of section 745] by a preponderance of the evidence.' [Citation.] The applicable remedies are set forth in subdivision (e) of section 745." (*Jackson, supra,* 109 Cal.App.5th at pp. 381-382; see § 745, subd. (c)(2); *People v. Bankston* (June 1, 2026, S044739) __ Cal.5th __ [2026 WL 1530539, *37].) "In an appeal from a trial court ruling that a defendant failed to make a prima facie showing of [an RJA] violation, we apply a de novo standard of review." (*Jackson,* at p. 382.)

3. *Zayas did not make a prima facie showing under section 745*

Like his argument in the trial court, Zayas's argument on appeal is difficult to discern. While the first half of his argument falls under a heading related to the RJA, the second half of his argument starts eight pages later, under an unrelated heading, and in the middle of an entirely different argument. (See Cal. Rules of Court, rule 8.204(a)(1)(B) [briefs must state each point under a separate heading and support each point with argument].)

To the extent Zayas alleges that Martinez's June 2018 traffic stop of Carrillo exhibited bias toward him, we agree with

41

the trial court that he failed to make a prima facie case. A defendant seeking relief under the RJA must "include copies of reasonably available documentary evidence supporting the claim." (*Finley v. Superior Court*, *supra*, 95 Cal.App.5th at p. 23; see *Jackson*, *supra*, 109 Cal.App.5th at p. 372.) Zayas supported his claim with citations to RIPA reports and the trial record. Accepting the truth of the RIPA reports, they demonstrate that in California "Hispanic/Latine(x) individuals were overrepresented in stops." But the trial record is devoid of any evidence regarding the June 2018 traffic stop of Carrillo. For example, there is no evidence regarding why Carrillo was stopped or what occurred during or after the stop. (Cf. *Jackson*, *supra*, 109 Cal.App.5th at pp. 386-388 [defendant made prima facie showing after submitting both statistical evidence *and* evidence concerning the traffic stop itself].) Because Zayas's allegations are conclusory and unsupported by the evidence, he failed to make a prima facie showing. (See *ibid.* ["statistical evidence alone would not be sufficient to show … officers' stop and search of [defendant] was the product of racial bias"].)

To the extent Zayas contends Martinez's December 2018 traffic stop of Hernandez exhibited bias toward him, the claim lacks merit. The trial testimony shows Martinez pulled over Hernandez for a traffic violation, and there was no one else in the car. "Notably, the RJA's relevant provisions prohibit bias or animus 'towards the defendant because of the defendant's race, ethnicity, or national origin.'" (*People v. Chhuon*, *supra*, __ Cal.5th at p. __ [2026 WL 1530451, *34], citing § 745, subd. (a)(1).) "In other words, the RJA's relevant provisions do not encompass bias or animus directed towards persons other than the defendant." (*Ibid*.) Zayas has neither explained nor put forth

any evidence showing how Martinez's traffic stop of Hernandez exhibited bias or animus toward Zayas. Thus, Zayas has failed to make a prima facie case for relief under the RJA.

H. *The Trial Court Did Not Abuse Its Discretion by Refusing To Strike Zayas's Prior Conviction Allegation*

The final section of Zayas's brief is 18 pages long, and the heading states: "Alternatively, Mr. Zayas is Entitled to Resentencing for His Conviction Based Upon the Court's Failure to Strike Mr. Zayas' Prior Felony Conviction Under Pen. Code Section 1385." Based on this heading, it appears Zayas is challenging the trial court's denial of his motion to dismiss his prior strike conviction under *People v. Superior Court (Romero)*, *supra*, 13 Cal.4th 497 and section 1385. However, the 18-page section includes, at most, one page of legal authority supporting Zayas's argument. The remaining 17 pages include citations to various sentencing laws that are relevant neither to Zayas's purported argument nor to the facts of his case. For example, Zayas devotes several pages to the law and legislative history surrounding one-year enhancements under section 667.5, subdivision (b), even though Zayas's sentence does not include such an enhancement.

Further, nowhere in the 18-page section does Zayas support the point made in the heading with any argument or citations to the record. (See Cal. Rules of Court, rule 8.204(a)(1)(B), (C) [every brief must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority" and citation to the record].) The only part resembling an argument is where Zayas states, "Here, several of the circumstances listed in [section] 1385, subdivision (c)(2) apply to … Zayas. Specifically,

43

application of the enhancement would result in a discriminatory racial impact [(§ 1385, subd. (c)(2)(A))]; the application of an enhancement resulted in a sentence of over 20 years [(§ 1385, subd. (c)(2)(c))]; the enhancement was based on a prior conviction that was over five years old [§ 1385, subd. (c)(2)(H))]."  But the new section 1385 provisions regarding dismissal of enhancements under subdivision (c) do not apply to strike offenses.  (*People v. Walker* (2024) 16 Cal.5th 1024, 1029, fn. 2 ["section 1385, subdivision (c), by its terms, only applies to enhancements and not the Three Strikes law, which is an alternative sentencing scheme"]; accord *People v. Burke* (2023) 89 Cal.App.5th 237, 243-244 ["The plain language of subdivision (c) of section 1385 applies only to an 'enhancement,' and the Three Strikes law is not an enhancement"]; *People v. Olay* (2023) 98 Cal.App.5th 60, 69.)

When a defendant claims the trial court abused its discretion by declining to strike a prior conviction allegation, the burden is on the defendant " ' "to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' "  (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377.)  Here, Zayas claimed in the section heading that the trial court abused its discretion, but he failed to support his claim with any cogent argument or citation to the record.  Providing only "[a] brief, conclusory allegation" with no "substantial argument or citation to authority" to support his contention "constitutes a waiver of the point on appeal."  (*People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1364, fn. 6; see *Multani v. Witkin & Neal* (2013) 215 Cal.App.4th 1428, 1458 [" 'Mere suggestions of

44

error without supporting argument or authority ... do not properly present grounds for appellate review.'  [Citation.] 'Hence, conclusory claims of error will fail.' "]; *In re S.C.* (2006) 138 Cal.App.4th 396, 408 [When a point is asserted without argument and authority for the proposition, " 'it is deemed to be without foundation and requires no discussion by the reviewing court.' "].)  Accordingly, we treat as forfeited Zayas's claim that the court abused its discretion during sentencing, and we presume the trial court acted properly when it sentenced Zayas under the Three Strikes law.

## DISPOSITION

The judgment is affirmed.


STONE, J.

We concur:


SEGAL, Acting P. J.


FEUER, J.

45